IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

JANELL AND T.J. JOHNSON, as co-special )
Administrators of the estate of C.J., )
deceased, )
                                                                       Plaintiffs, )
)
v. )   No. CIV-16-003-JHP
)
THE UNITED STATES, ex rel. )
THE CHICKASAW NATION )
MEDICAL CENTER, )
)
                                                                       Defendant. )

**OPINION AND ORDER**

Christian Johnson (C.J.) was the son of Plaintiffs Janell and T.J. Johnson. On May 26, 2015, C.J. ingested some of his grandmother's extended release morphine tablets. He was taken to the emergency department at the Chickasaw Nation Medical Center in Ada, Oklahoma. He was observed in the emergency department for approximately 4 hours for signs of morphine ingestion. After this observation period, the decision was made to release C.J. C.J. returned to his grandparents' home with his mother. In the morning hours of May 27, 2015, C.J. died from acute morphine toxicity.

On January 5, 2016, Janell and T.J. Johnson, as the administrators of the estate of C.J, filed a Federal Tort Claims Act (FTCA) suit against the Defendant. The lawsuit alleges negligent medical care of their son, C.J., by the staff at Chickasaw Nation Medical Center. Specifically, Plaintiffs allege the doctor who provided care to C.J. failed to consider the symptomatology of extended release morphine toxicity in children under the age of three, which is significantly

different from adults, and requires an extended period of observation of more than 4 hours. They allege this failure proximately caused the death of C.J. Defendant claims the care and treatment C.J. received was appropriate in all respects.

This matter came on for non-jury trial November 1, 2016 through November 4, 2016.

### **FINDINGS OF FACTS**[1]

1. C.J. Johnson was the natural child of Janell and T.J. Johnson. (Trial Transcript Vol. I page, 9 lines 20-25 and Trial Transcript Vol. III page 481, lines 20-24). Sharon and Kelton Welch are C.J.'s grandparents. (Trial Transcript Vol. III page 492, lines 12-22).

2. On the evening of May 26, 2015, C.J. was at his grandparents' house for dinner. Sharon Welch, C.J.'s grandmother, left her weekly pill dispenser on a night stand. The medication dispenser held multiple medications including morphine. Sharon noticed pills missing from the dispenser. The family looked for the missing pills. (Trial Transcript Vol. I page 13, lines 8-11, page 20, lines 16-25, page 21, lines 1-3 and Trial Transcript Vol. III page 537, lines 1-11, page 540, lines 18-21, page 543, lines 5-9).

3. C.J. was suspected of ingesting the medication, including two 30 mg extended release morphine tablets. The family believed C.J. ingested the pills between 6:30p.m.-7:30p.m. (Trial Transcript Volume I page 15, lines 15-17, page 77, lines 1-8 and Pill Bottles Plaintiff's Trial Exh. 10).

4. Around 8:09 p.m., T.J. called the Poison Control Center and informed them it was suspected their two year old son had ingested his grandmother's medications including two 30 mg tablets of morphine. The Poison Control Center instructed T.J. to take his son to an emergency department for observation. (Defendant's Trial Exh. 6-Oklahoma Poison Control Center Records).

5. The Poison Control Center called The Chickasaw Nation Medical Center to alert them to C.J.'s arrival. Poison Control informed Nurse Christy Elliot

---

[1] "Rule 52 (a) does not require the district court to set outs its findings and conclusions in excruciating detail. As stated in the advisory committee notes to Rule 52, the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for overelaboration of detail or particularization of facts." OCI Wyoming, L.P. v. PacifiCorp, 479 F.3d 1199, 1204 (10th Cir. 2007)(internal citations omitted).

2

that C.J. was suspected of ingesting morphine tablets. (Defendant's Trial Exh. 6-Oklahoma Poison Control Center Records).

6. Janell and her father Kelton Welch drove C.J. to Chickasaw Nation Medical Center in Ada, Oklahoma. C.J. arrived at the emergency department at 8:55 p.m. (Trial Transcript Vol. I, pages 22, lines 10-22 and Defendant's Trial Exh. 1-Medical Records from Chickasaw Nation Medical Center).

7. Upon arrival at the emergency department, C.J. was immediately triaged and put into a room. (Trial Transcript Vol. I, pages 27, lines 8-12 and Defendant's Trial Exh. 1-Medical Records from Chickasaw Nation Medical Center).

8. Dr. Justin Roulston and Nurse Christy Elliot were charged with C.J.'s care while he was in the emergency department. (Trial Transcript Vol. I, pages 27, lines 13-25).

9. When Dr. Roulston entered the room, Janell handed him the prescription bottles of the pills C.J. was suspected of taking. Morphine was the only medicine with which Dr. Roulston was concerned. (Trial Transcript Vol. I, pages 27, lines 24-25 and page 28, lines 1-5 and Trial Transcript Vol. II, page 168, lines 14-25 and page 169, lines 1-9).

10. 60 mgs of extended release morphine is a fatal dosage in a two year old if not treated. (Trial Transcript Vol. II, page 170, lines 1-3).

11. C.J. was placed on monitors. Dr. Roulston told Janell he would run a blood and urine test. (Trial Transcript Vol. I, page 33, lines 14-18).

12. The blood was drawn around 10:00 p.m. but the urine was never taken. (Defendant's Trial Exh. 1-Medical Records from Chickasaw Nation Medical Center).

13. C.J. vomited between 11:00 p.m. and 12:00 a.m. (Trial Transcript Vol. I, page 80, lines 17-25, page 81, lines 1-12).

14. One episode of tachycardia was noted in the medical records. (Defendant's Trial Exh. 1-Medical Records from Chickasaw Nation Medical Center).

15. After four hours of observation in the emergency department, C.J. was released at 1:01 a.m. (Defendant's Trial Exh. 1-Medical Records from Chickasaw Nation Medical Center).

16. Janell and Kelton were told by Dr. Roulston and Nurse Elliott to wake C.J. occasionally to make sure he aroused easily. (Trial Transcript Vol. II, page 211, lines 24-25, page 212, lines 1-2 and Trial Transcript Vol. VI page 609, line 25 and page 610, lines 1-2).

17. C.J. returned to his grandparent's home around 2:00 a.m. He went to sleep in his grandparents' bed. (Trial Transcript Vol. I, page 102, lines 22-25, page 103, lines 12-16).

18. Between 2:00 a.m. and 4:30 a.m., Kelton would gently nudge C.J. around his ribs to see if he would move. However, he did not want to wake him. Kelton and Sharon did not wake him at any time during the night. (Trial Transcript Vol. III page 518, lines 15-23 and Trial Transcript Vol. IV page 553, lines 1-6).

19. C.J. died in the morning hours of May 27, 2016. (Defendant Exh. 4- Office of The Chief Medical Examiner).

20. C.J. died from acute morphine toxicity. (Defendant Exh. 4- Office of The Chief Medical Examiner).

21. Dr. Carl Dahlberg, an emergency room physician, is Board Certified by the American Board of Emergency Medicine. He testified on behalf of Plaintiffs. (Trial Transcript Vol. II, page 252, lines 13-24).

22. Dr. Dahlberg testified at trial the national standard of care required that a two year old with suspected morphine ingestion should have been admitted into the hospital. (Trial Transcript Vol. II, page 299, lines 8-19).

23. Dr. Dahlberg had previously stated the national standard of care required an extended observation period of 8-10 hours. (Trial Transcript Vol. II, page 308, lines 3-18).

24. Janell and T.J. testified that C.J. was an integral part of the family and his loss was very hard on everyone. Janell suffered depression and T.J. suffered guilt and anger over C.J.'s death. (Trial Transcript Vol. I page 10, lines 15-25, page 11, lines 1-6. Page 65, lines 1-20 and Trial Transcript Vol. III page 482, lines 1-25, page 483, lines 1-11).

25. The funeral expenses for C.J. were $4,580.63. (Trial Transcript Vol. I page 66, lines 4-9 and Plaintiffs' Exh. 15-Bill for Funeral Expenses).

# CONCLUSIONS OF LAW

1. This is an action under the Federal Tort Claims Act, 28 U.S.C. Sec. 1346 (b), 2671 et seq.

2. Jurisdiction is proper in this Court.

3. The employees of Chickasaw Nation Medical Center, while acting under the scope of their employment, are deemed employees of the United States for purposes of the Federal Tort Claims Act, 28 U.S.C. Sec. 1346 (b) and 28 U.S.C. Sec. 2671 et seq.

4. A Federal Tort Claims Act action "mandates application of the law of the place to resolve questions of substantive liability." 28 U.S.C. Sec 1346 (b)(1) and Cannon v. United States, 338 F.3d 1183, 1192 (10th Cir. 2003).

5. This requires the court to apply the law of the place where the alleged negligence occurred. Austin v. U.S. ex rel. Dept. of Health and Human Services, 16 F.3d 415 (10th Cir. 1993).

6. Under Oklahoma law, Plaintiffs have the burden of proving: (1) a duty owed by the defendant to the plaintiff to use ordinary care; (2) a breach of that duty, and (3) the injury is proximately caused by the breach. The standard of care required for those engaged in the practice of the healing arts in Oklahoma is measured by national standards. Grayson v. State, 838 P.2d 546, 549-550 (Okl. 1992).

7. Under Oklahoma law, the rule in medical malpractice cases is that a physician's negligence must ordinarily be established by expert medical testimony. Harder v. F.C. Clinton, Inc., 948 P.2d 298, 305 (Okl. 1997).

8. Liability for damages caused by two or more persons shall be several only and a joint tortfeasor shall only be liable for the amount of damages allocated to that tortfeasor. 23 O.S.A. Sec. 15 (A).

9. The negligence of tortfeasors not parties to the lawsuit should be considered in order to properly apportion the negligence of those tortfeasors who are parties. Myers v. Missouri Pacific Railroad Company, 52 P.3d 1014, 1030 (Okl. 2002).

10. The trier of fact, whether court or jury, must determine the effect and weight to be given to conflicting or inconsistent expert testimony. McCoy v. Oklahoma Farm Bureau Insurance Company, 841 P.2d 568, 570 (Okl.

1992). "When a district court acts as a fact finder it is not obligated to accept uncontradicted expert testimony." <u>Duplan v. Harper</u>, 188 F.3d 1195, 1202-1203 (10th Cir. 1999). "Any determination of the credibility of a witness necessarily includes the right of the fact finder to disbelieve the witness." <u>Neece v. IRS</u>, 41 F.3d 1396, 1399 (10th Cir. 1994).

11. To assess damages for loss of companionship, it is not necessary for the Plaintiff to establish a pecuniary value. The damages can be determined from the observation, experience and knowledge of the fact finders. <u>Carraco Oil Company v. Morhain</u>, 380 P.2d 957, 959 (Okl. 1963)(internal citations omitted).

## **FINDINGS**

1. The national standard of care required Dr. Roulston to observe C.J. in the emergency department for either 8-10 hours or overnight.

2. Regardless of which national standard of care the court utilizes, Dr. Roulston did not observe C.J. for the required period of time. As a result, Defendant failed to meet the national standard of care and is found negligent.

3. Sharon and Kelton Welch are also found to be negligent. Sharon Welch was negligent in leaving her medication within reach of a two year old. Kelton Welch was negligent in not occasionally waking C.J. during the night to see if he was easily arousable as instructed to do.

4. The court finds:

    | | | |
    |---|---|---|
    | Defendant | 80% | negligent |
    | Sharon Welch | 10% | negligent |
    | Kelton Welch | 10% | negligent |

5. The court awards damages to the Plaintiffs as follows:

    | | |
    |---|---|
    | Burial Expense: | $4,580.63 |
    | Loss of companionship and love of the child: | |
    | T.J. | $250,000.00 |
    | Janell | $250.000.00 |

Destruction of parent-child relationship:

| | |
|---|---|
| T.J. | $250,000.00 |
| Janell | $250,000.00 |

Total Award of Damages:     $1,004,580.63

**IT IS SO ORDERED** this 15th day of February, 2017.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma